The defendant is appealing from the judgment of the district court awarding plaintiff compensation at the rate of $14.65 per week for the period beginning August 24, 1944 and ending December 31, 1944 and thereafter for $4.88 per week during the period of his disability not to exceed 300 weeks from November 17, 1943.
Plaintiff has answered the appeal praying that the judgment in his favor be amended so as to award him judgment at the rate of $14.65 per week during the period of his disability not to exceed 400, weeks beginning November 17, 1943, less amounts paid as compensation, which payments appear to have been made to August 24, 1944.
Plaintiff alleges he was injured October 17, 1943 while working for defendant in, the course of his employment, at a weekly wage of $25, but it is now conceded that his injury occurred November 17, 1943 and that his rate of pay was $22.55 per week. He alleges that he has not recovered and that his injuries totally and permanently disable him to do work of any reasonable kind.
The defense is that plaintiff was fully recovered by August 24, 1944 and able to return to work and that defendant owes, him nothing more. However, when the case was called for trial, defendant made a tender of compensation at the rate of $14.65 per week up to December 31, 1944.
[1] The learned judge of the lower court has favored us with written reasons *Page 313 
for his judgment. He has, in our opinion, fairly stated the facts and correctly applied the law. We quote from his opinion:
"This is a compensation suit in which plaintiff employee, claiming to be totally and permanently disabled as the result of an injury suffered by him on November 17, 1943, seeks to recover of defendant employer judgment for 65% of his weekly wages for a period not to exceed 400 weeks, less credits for compensation already paid.
"The defense is that plaintiff has fully recovered from his injury and that defendant has fully discharged its liability to him.
"Plaintiff is a 50-year old colored man and, for about two years prior to his injury, had been working in the rip-saw department of defendant's flooring manufacturing plant as 'clean up man.' As such his work consisted principally of keeping the floors cleaned of sawdust, small sticks and scraps. In this the implements principally used by him were a broom and a four-wheel buggy into which he dumped the trash to be carried out. He was not employed to operate any machine and was not qualified nor required to do so, although, at times, he had been permitted to relieve men who did and who were required temporarily to leave the building.
"Prior to his employment with defendant, plaintiff testified that he had worked on relief and at other work, the nature of which he simply described as common labor.
"On the day of his injury, plaintiff was attempting to put a belt on a pulley when his right forearm was caught between the belt and the moving pulley. Both bones in the right forearm sustained oblique fractures — one in the radius, located about the junction of the lower and middle thirds and one in the ulna in the middle third about 2 or 21/2 inches higher. He also received a laceration of the scalp on the back of the head, doubtless from contact with the floor or some other object as he was jerked and thrown violently when his arm was caught. There was no head fracture, the laceration required a couple of stitches to close, and plaintiff has suffered no ill effects from the injury to his head.
"Plaintiff was removed to the Tri-State Hospital where Dr. J.C. Willis, under whose treatment he was placed, made x-ray examinations and undertook to reduce the arm fracture by the closed reduction method. However, x-ray examination made by him one week later on November 24, 1943, showed that the position and alinement of the bones were not satisfactory and an open reduction was considered necessary. Accordingly, before the bones had united, Dr. Willis did the operation on December 1, 1943, bridging the fractures with non-corrosive metal plate, and again set the arm in cast to immobilize it.
"The medical testimony preponderates, and we find, that no other bones on plaintiff's arm, wrist, hand or fingers were injured in the accident. Without doubt, however, in addition to the fractures of the forearm bones, the soft tissues of the arm received severe trauma and consequent damage.
"All of the medical testimony given in the case affirms that the method used by Dr. Willis was usual and proper in this type of case, where two bones must be set, and that his work was well done.
"Plaintiff's arm remained in cast about 2 1/2 months after the open reduction, which, with the two weeks after the attempted closed reduction, made a total of 3 months immobilization in cast. Dr. Willis testified that in this type of case, this was the 'usual time.' We find no contradiction of this in the medical testimony.
"After plaintiff's arm was removed from the cast, Dr. Willis had plaintiff return at frequent intervals for observation and instructed him to begin using the arm and hand in order to relieve the weakness and stiffness resulting from extended immobilization. The medical testimony convinces us that this, the active use of the member, is the only effective way to restore normal flexibility and function. Necessarily, discomfort and some pain will accompany the effort, but it has been held repeatedly by the appellate courts that, nevertheless, the effort must be made in good faith.
"About August 23, 1944, Dr. Willis dismissed plaintiff as able to return to work. Mr. O.E. Gardner, defendant's Secretary-Treasurer, and plant manager, bad previously instructed plaintiff to return to work whenever the doctor released him and he would 'find something for him to do.' Plaintiff did not return to work with defendant and it discontinued the compensation payments as for total disability, being 65% of his wages, which it had made without *Page 314 
interruption since plaintiff's injury. Defendant had also furnished medical and hospital service which it alleges to be greatly in excess of the maximum required by law. We assume this to be the fact, as plaintiff does not ask for any allowance therefor in this suit which he filed on September 9, 1944.
"Plaintiff particularizes his injuries and his asserted total permanent disability, as follows:
" 'Both bones in his lower right a were crushed and fractured many times all the way from within one inch of his wrist to within four inches of his elbow, and the ligaments, nerves and muscles in his said lower arm and hand and wrist are seriously and permanently impaired; that there is lack of union in the said broken bones, bad apposition in same; that the said arm is crooked seriously in the places where said bones were thus broken; that all of the fingers of his right hand are stiff and he cannot close same; that he has practically no grip in his right hand, has little sensation in his hand or lower right arm; that his entire right arm is seriously and permanently weak; that his skull was fractured, and the ligaments, muscles and nerves of his neck and arms seriously and permanently impaired; that his eyes were seriously and permanently impaired and sight in them seriously impaired; that he now has constant and serious pains in his head and brain, especially when he exerts himself.'
"The case came on for trial on April 24, 1945, and defendant's counsel tendered to plaintiff in Open Court an amount equal to 65% of his wages as compensation for the period of August 24, 1944, to and including December 31, 1944, with interest, plus accrued court costs. The tender was refused and trial thereupon was had.
"It was shown on trial that plaintiff had secured employment as night porter at the City Bank Building in Shreveport on or about January 1, 1945, and was still so employed on the day of trial. Mr. A.G. Hughes, building superintendent who hired him, described plaintiff's work there to be running the elevator and keeping up ten halls. The elevator is controlled by a handle on the operating part and it has an eccentric bar that opens the door and, according to Mr. Hughes, the door was 'usually opened with the left hand and operate the elevator with the right hand.' Keeping the halls involved sweeping and mopping, requiring the handling of broom, mop and a five gallon mop bucket. Plaintiff works from nine o'clock at night until six in the morning, seven days a week. He made no mention of his previous injury and has never made any complaint of any pain or discomfort to Mr. Hughes, who testified that plaintiff has worked continuously since he started losing 'just a couple of nights.'
"The medical testimony in the case is, as usual, conflicting. By it we are convinced to find that the fractures in plaintiff's forearm are completely healed with good bony union, that the bones thereof are in good approximation and alignment, within the range of normal, that the wrist motion is free and that there is no injury or disease of any other bones of arm or hand. We do find, however, that plaintiff still has a slight residual disability in that the fingers of his right hand are still somewhat stiff, his grip is definitely weaker than in the left hand and his right forearm is, as yet, not quite the size of his left. Although he has full extension of the fingers, he does not fully flex or close them into the palm beyond 75% of normal. However, the Court observed well-formed callouses and corns in and across the palm of plaintiff's right hand, a fact commented upon by the witness, Dr. Willis Taylor, an orthopedic surgeon, who examined plaintiff several times between June 22, 1944, and April 23, 1945, the day before the trial, as well as in court on the trial, as being necessarily the result of gripping. Dr. Taylor also, testified that he had no trouble, when the hand was relaxed, in forcing the fingers all the way into the palm, which would have been impossible if there had been adhesive bands restricting motion. The Court observed also that plaintiff used the fingers of his right hand to unbutton his coat.
"It is our conclusion that plaintiff's present slight residual disability is due to the immobilization and disuse of his arm, hand and fingers, the normal use and function of which will likely be eventually restored by continued active use. Considering the similarity of the work plaintiff has successfully, and without complaint, performed since January 1, 1945, to that he was performing for defendant when injured, and the conclusions we have heretofore expressed, we think plaintiff, since January 1, 1945, has not been totally disabled to do work of a reasonable character within the intent of Workmen's Compensation, but that his disability has been, and was on the *Page 315 
day of trial, only partial, in that the performance of his work is made more difficult thereby.
"In view of defendant's tender, heretofore shown, plaintiff is entitled to recover as for total disability from August 23, 1944, through December 31, 1944. Since then, we think his recovery must be limited to compensation provided in Sec. 8, 1(C) of the Workmen's Compensation Act for partial disability, or 65% of the difference between his wages at the time of injury and the wages he is earning now, not exceeding the total of 300 weeks.
"Plaintiff was employed by defendant on a five-day-week basis and his average weekly earnings were $22.50 per week. He is presently employed on a seven-day-week at $21.00 per week. His daily wage under the former employment was $4.50 per day, and under the latter, it is $3.00 per day, a difference of $1.50 per day. On the five-day week basis of his former employment, he now earns $7.50 less per week than he did then, 65% of which difference is $4.88.
"Accordingly, there is judgment in favor of plaintiff and against defendant in the amount of $14.65 per week, beginning August 24, 1944, and up to and including December 31, 1944, and, thereafter, in the amount of $4.88 per week during the period of plaintiff's disability, not, however, beyond 300 weeks from November 17, 1943, with legal interest on each payment from its due date, and all costs of this suit, including the fees of plaintiff's medical witnesses, which are hereby fixed at $25.00 each.
"The fee of plaintiff's attorney is hereby fixed at 20% of the amounts herein adjudged to plaintiff."
The defendant contends that the judgment should be amended so as to allow plaintiff to recover only the amount tendered for the period from August 24 to December 31, 1944. It contends that the medical testimony is practically all to the effect that it is necessary to exercise the hand in cases of injury such as plaintiff sustained (though the doctors disagree as to whether the exercise should be voluntary or passive, that is, by means of massage), and cites a number of cases where compensation has been denied because the claimant refused to follow the doctor's instructions to exercise the injured member. Myles v. Forcum-James Co. et al., La-App.,16 So.2d 542; Thompson v. Meeker Sugar Ref. Co. et al., La-App., 168 So. 325; Daste v. Gwin et al., 13 La. App. 378, 128 So. 41; Bywog v. La-Tex Community Oil Co., Inc., 3 La. App. 699; Costello v. French Market Ice Co., La-App., 159 So. 466; Hardin v. Higgins Oil Fuel Co., 147 La. 453; Savin v. T. Smith Sons, Inc., La. App., 143 So. 728.
With the exception of Hardin v. Higgins Oil Fuel Co., the above cases appear to be in point. It is not shown that Hardin was given any instructions by the doctors to exercise his hand.
Defendant says its manager, Mr. Gardner offered to return plaintiff to work when the doctor dismissed him and that he refused to go back to the plant to work. But after Mr. Gardner talked to plaintiff about going back to work he talked to Mr. Caldwell about his compensation and he says (tr. ev., 52 and 53): "1 asked you about it and you said you had nothing to do with it and I didn't go nowhere. I hadn't been instructed back out there to work. That is the reason I didn't go. You was the man that was supposed to give me some instruction about it."
Then Mr. Caldwell said: "I did not have anything to do with it."
Plaintiff answered: "Thaes the reason I didn't go. I asked you about it and you said you didn't have nothing to do with it and I didn't know anybody else to go to. I was first to come to you and from you to him. That was my understanding."
Mr. Caldwell then asked him: "Do you deny I told you to go back to work whenever you wanted to?"
And he answered: "I come to you and you offered me $193.00 settlement and I asked you and you said you didn't have nothing to do with a job, because I didn't take $193.00."
[2] Mr. Caldwell testified in the case (tr. ev., 118), but he made no denial of the above testimony of plaintiff. In fact, he made no mention of it so we conclude that plaintiff is not to be denied compensation because he did not go back to the plant and try to go to work there. He apparently was urged by necessity and the police when he finally went to work about January 1, 1945.
Counsel for plaintiff registers five specific complaints to the opinion of the trial judge: "1. The serious and apparently permanent wrist injury found and testified about by Drs. G.H. Cassity, J.H. Cannon *Page 316 
and C.H. Mosely, and not specifically testified about by other physicians was not mentioned in the said opinion."
With reference to this complaint, the district judge has, as shown by his reasons for judgment, apparently consideredall of the medical testimony. "2. The trial Court erroneously held the work of a temporary nature plaintiff had done as night porter at an office building beginning about January 1, 1945, at $3.00 per night was similar work to that he was doing when injured, but not holding that plaintiff impairments would allow him to do the work of putting a belt on a moving pulley he was doing when injured, awarded compensation for 65% of the difference of said wages after or beginning January 1, 1945. Said holding was contrary to the jurisprudence of the Supreme Court of Louisiana and the jurisprudence of the First Circuit Court of Appeals of this State."
It is apparent that the trial judge reached the conclusion that the work plaintiff is now doing is similar in character to the work he was doing when injured and that he could now do the work, though the disability he had at the time of the trial would make it more difficult for him.
"3. The trial Court overlooked the fact that the answer of the defendant did not aver that plaintiff was injured while doing work not in the course of his employment, and that when plaintiff objected to defendant introducing testimony to show plaintiff was acting outside of his employment when injured, the objection was sustained, but testimony permitted introduced for purpose of showing circumstances surrounding the accident. (Tr. 97.)
"However, the evidence shows he was acting within his employment when injured."
We do not understand from the trial judge's reasons for judgment that he held, or intended to hold that plaintiff was not working in the course of his employment when injured. In fact, defendant admits in paragraph 2 of its answer that he was so working.
"4. The trial Court in holding 'he was not employed to operate any machine and was not qualified nor required to do so, although at times he had been permitted to relieve men who did and who were required temporarily to leave the building,' was in error as to the facts and weight of testimony. The proof shows that plaintiff was hired primarily to operate machinery, and did the cleaning at noon and at six o'clock. Under cross-examination the ripsaw foreman, R.R. Ballard, testified in part as follows:
" 'Q. What kind of job was he employed to do? A. Running ripped lumber.
" 'Q. Had to manipulate levers or anything? A. Yes.' (Tr. 99.)"
We believe that the evidence justifies the conclusion reached by the trial judge that plaintiff was not employed to operate any machine and was not required to do so. The chains referred to were used to carry away refuse. The levers he operated are not machinery in the usual sense. It is true that, according to the testimony of his superiors, he was not employed to do these things and his foreman says that it was his own duty to put on the belt that plaintiff was attempting to put on when injured. However, the foreman said that plaintiff had put the belt on many times before to his knowledge. This, however, is not the issue in the case, which is whether or not plaintiff is totally disabled. "5. The trial Court erroneously held 'that the wrist motion is free,' with little, if any, testimony to support said holding and with Drs. G.H. Cassity, J.H. Cannon and C.H. Mosely testifying to a serious, permanent impairment as found by them in manipulating the wrist. The trial Court evidently did not notice said testimony since it did not refer to same."
[3] The medical testimony with reference to "wrist motion" is in hopeless conflict. The trial judge saw and heard the witnesses and observed plaintiff at the time of the trial and his finding of fact is not to be disturbed unless manifestly erroneous. With reference to the judge's failure to refer to the doctors by name, we have quoted above what he had to say about the medical testimony. He must have consideredall of the medical testimony in reaching his conclusion.
[4] We have inspected the X-ray pictures filed in evidence, but must of necessity accept the interpretation placed on them by the experts, and in this case their interpretation is as conflicting as the other medical testimony.
Plaintiff has cited a number of cases in support of his claim of total and permanent disability. We have examined all of the cases cited and list them below *Page 317 
Parker v. Weber-King Mfg. Co., 19 La. App. 177, 139 So. 660. This is a hernia case where the hernia was described as incomplete by some of the doctors and complete by others. The court held that whether it is complete or incomplete is immaterial as it is disabling in either case.
Crowe v. Equitable Life Assur. Soc. of U.S., 179 La. 444,154 So. 52, is a suit on an insurance policy. Plaintiff in that case was found to be totally and permanently disabled due to a fractured vertebra and other injuries.
Biggs v. Libbey-Owens-Ford Glass Co. et al., La. App., 178 So. 639, is another hernia case. Plaintiff worked irregularly as a barber and suffered pain while doing this type of work. The court held that he was totally and permanently disabled and awarded him compensation accordingly.
Wood v. Peoples Homestead Savings Ass'n et al., La. App., 177 So. 466, is also a hernia case where the court found plaintiff totally and permanently disabled, though he was able to drive his car and collected some accounts, earning about $20 per month.
Ingram v. Meridian Lumber Co., La. App., 178 So. 187, is a case in which plaintiff's left leg was fractured between the hip and knee and resulted in shortening of the leg 13/4 inches and a stiffened knee with arthritic condition. In that case plaintiff was found to be totally and permanently disabled.
Stieffel v. Valentine Sugars, Inc., et al., 188 La. 1091,179 So. 6, is a case in which plaintiff, a stenographer, while on an errand for his employer was involved in an automobile accident in which he sustained serious permanent injury to his hip. The court found that he was unable to work and awarded him compensation not exceeding 400 weeks.
Ranatza v. Higgins Industries, Inc., 208 La. 198,23 So.2d 45, 46, is a Supreme Court case affirming court of appeal,18 So.2d 202, in which the court said: "This court has held in two cases, namely, Knispel v. Gulf States Utilities Co.,174 La. 401, 141 So. 9, and Stieffel v. Valentine Sugars,188 La. 1091, 179 So. 6, that when an employe is a skilled mechanic, or is trained and experienced in a special trade, and when the injury causes a total disability to continue carrying on the trade or the work for which alone the employee is suited by training and experience, and causes total disability to do any work of a similar character, the disability must be considered as total disability to do work of any reasonable character, in the meaning of paragraph (a), (b) and (c) of subsection 1 of section 8 of the Employers' Liability Act, Act No. 20 of 1914, as amended by Act No. 242 of 1928, p. 357, notwithstanding the injured employee may have succeeded in obtaining, after the accident, employment of a different kind and not requiring any special skill or training. The same rule has been followed consistently by the courts of appeal, specifically, in the following cases: McQueen v. Union Indemnity Co., 18 La. App. 612, 136 So. 761; Yarbrough v. Great American Indemnity Co., La. App., 159 So. 438; Custer v. New Orleans Paper Box Factory, La. App., 170 So. 388; Hibbard v. Blane, La. App., 183 So. 39; Anderson v. May, La. App., 195 So. 783; Sumrall v. E. I. DuPont De Nemours Co., La-App., 1 So.2d 430; Phillips v. Wholfeld, La. App., 10 So.2d 258; Thompson v. Leach McClain, La. App.,11 So.2d 109; McKenzie v. Standard Motor Co., La. App.,15 So.2d 115. The rule is particularly applicable to this case, where the employment obtained since the accident requires no special training or skill, such as that which makes a carpenter or a member of any of the other mechanical trades somewhat independent in the matter of obtaining employment at desirable wages."
Brown v. Continental Oil Company, La. App., 22 So.2d 758, 761, is a case in which plaintiff sustained severe fractures of his left leg, which the court found had not completely healed at the date of trial. It was shown that he had worked as a welder at higher wages but lighter work than he bad been doing. Reversing the lower court, the court of appeal said: "It is admitted that he earned better wages in California than he did with the defendant oil company and it is urged that he could go back to that job as indeed he intends to do. Gonceding that that is so and that he does go back, under rulings made by this Court in certain cases this should not deprive him of his right to recover compensation from the employer he was working for at the time of his injury. It is not the same kind of work he was doing and he will have a new and different employer. Two of the cases we refer to are McKenzie v. Standard Motor Co., La. App.,15 So.2d 115 and Thompson v. Leach McLain, La. App.,11 So.2d 109."
Hines v. Louisville Cooperage Co. et al., La. App.,19 So.2d 911, involves an injury *Page 318 
to wrist and arm and plaintiff was found disabled temporarily and unable to do work of the same kind he was doing when injured and was awarded compensation for not exceeding 300 weeks. His injury appears to have been much more disabling than that of plaintiff in the instant case.
Lee v. International Paper Co., La. App., 16 So.2d 679, is a case in which the plaintiff sustained fractures of radius and ulna, very similar to the injuries of plaintiff in the instant case, and the fracture was reduced in the same manner. Lee was found to be 25% disabled by the district court and awarded judgment not exceeding 300 weeks. The court of appeal amended the judgment, finding that the plaintiff was totally disabled and awarded 'compensation not exceeding 400 weeks. In the cited case, it was shown that the screws in the plates in plaintiff's arm protruded through the bone and into' the tissues of the arm and the court of appeal evidently found that this was the cause of pain that plaintiff complained of and made its award on that basis. In the instant case, Dr. Moseley, testifying for plaintiff at page 10 of the transcript of his evidence, was asked:
"Q. Do you find that the screws protrude through the bone?" A. That wouldn't hurt it. Now, at one place it looks like it might go through."
Jamison v. Encarnacion, 281 U.S. 635, 50 S.Ct. 440, 74 L.Ed. 1082, is a case where a stevedore was assaulted and seriously injured by his foreman and has, so far as we can see, no application to the case under consideration.
Burt v. Davis-Wood Lumber Co., 157 La. 111, 102 So. 87, is a suit by a widow for compensation for herself and children on account of the death of her husband and we can see no connection between the issues in the cited case and the one under consideration.
One other case, Anderson v. May, La. App., 6 So.2d 174, has also been cited. Counsel evidently intended to cite the same case reported in 195 So. 783, where the plaintiff was awarded compensation for total disability. In 6 So.2d 174, the defendant was relieved from paying plaintiff any further compensation.
The injury to plaintiff's hand seems to have been more serious than the injury in the present case, which is confined to partial stiffening of the fingers. In the Anderson case plaintiff lost two thirds of the ring and little fingers and the other two fingers were injured. While compensation for 400 weeks was awarded in a final judgment on June 5, 1940, judgment relieving the defendant from further payments was made final on March 17, 1942 and writs refused by the Supreme Court on April 27, 1942. 6 So.2d 174.
As said earlier in this opinion, we are in accord with the findings of the district judge and for these and the other reasons set forth, the judgment appealed from is affirmed. Defendant-appellant to pay the costs of both courts.